

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

May 2, 2025

**BY ECF**
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

   Re:  **United States v. Farhane**, 05 Cr. 673 (LAP)
       **United States v. Farhane**, 18 Civ. 11973 (LAP)

Dear Judge Preska:

  The Government respectfully submits this letter in opposition to defendant Abderrahmane Farhane's motion regarding the scope of the waiver of attorney-client privilege in his 28 U.S.C. § 2255 petition. The § 2255 petition asserts a claim under Strickland v. Washington, 466 U.S. 668 (1984) against the defendant's prior counsel, Michael Hueston, Esq. ("Predecessor Counsel"). The defendant argues that he has waived privilege only as to communications with Predecessor Counsel "regarding the potential denaturalization or deportation consequences of his plea." (Doc. No. 290 ("Def. Br.") at 1.)[1] The Government agrees the privilege has been waived as to those communications. But the scope of the waiver extends further.

  A defendant who asserts a Strickland claim is deemed to have waived the attorney-client privilege as to all communications relevant to that claim. See, e.g. Frias v. United States, 2009 WL 1437797, at *1 (S.D.N.Y. May 20, 2009); Graziose v. United States, 2004 WL 102699, at *1 (S.D.N.Y. Jan. 21, 2004). As the Second Circuit's en banc opinion in this case made clear, the defendant made numerous factual assertions that are relevant to his Strickland claim, including the "assertion that, had he been properly advised, he would have insisted on proceeding to trial" and that, at the time of the plea, he understood he had "viable defenses at trial." (Farhane v. United States, 20-1666 (2d Cir. Oct. 31, 2024) (en banc), Doc. No. 277 ("En Banc Op.") at 36.) In the defendant's affidavit originally seeking relief in this Court, the defendant also described his communications with Predecessor Counsel about: the perceived strength of the Government's case and the likelihood of an acquittal at trial, the possible sentencing outcomes if the defendant pleaded guilty rather than proceeding to trial, the weight that the defendant placed on limiting the term of imprisonment, the weight that the defendant placed on United States citizenship and being able to remain in the United States, and plea negotiations that predecessor counsel undertook on the

---

[1] Citations to ECF filings refer to each filing's internal pagination, not the ECF pagination.

defendant's behalf. (Doc. No. 232 ¶¶ 27–43.) By putting those communications before the Court in support of his § 2255 petition and his appeals, the defendant waived privilege as to communications about these topics. The Government respectfully submits a Proposed Order, annexed hereto as Exhibit A, finding that the attorney-client privilege has been waived as to each of these topics.

The defendant also asks the Court to issue a Protective Order restricting the Government's use of materials as to which the Court finds that the attorney-client privilege has been waived. (Def. Br. at 19.) Specifically, the defendant argues that the Government should not be permitted to use such materials in any re-prosecution of the defendant or to share them with attorneys handling the defendant's denaturalization case. Indeed, the defendant goes so far as to demand that the Government be ordered to assign new prosecutors to this case in the event he is re-prosecuted. (Id.) Each of these demands is meritless.

## I. Relevant Facts and Procedural History[2]

Following the September 11, 2001 terrorist attacks, the defendant was recorded—on various occasions between December 2001 and March 2002—speaking with a confidential source ("CS-1") about sending money to terrorists abroad. On those occasions, the defendant offered suggestions about how to send money to jihadist fighters. (Presentence Investigation Report ("PSR") ¶¶ 9–13.) He introduced CS-1 to Tarik Ibn Osman Shah, a terrorist who would later be charged with conspiring to provide material support to Al Qaeda. (Id. ¶ 14.) During at least part of this period, the defendant had a pending naturalization proceeding. (Doc. No. 232 ¶ 13.) In April 2002, the defendant became naturalized U.S. citizen. (Id. ¶ 15.) In 2005, law enforcement officers interviewed the defendant about his interactions with CS-1 and Shah; the defendant lied during those interviews. (PSR ¶¶ 15–17.)

On October 26, 2005, the defendant was arrested and charged by Complaint. From then through sentencing, the defendant was represented by Predecessor Counsel. On February 8, 2006, the defendant was charged, in a Superseding Indictment, with one count of conspiring to provide material support for terrorism and one count of making false statements. On November 9, 2006, the defendant entered a guilty plea, pursuant to an agreement with the Government, to one count of conspiring to commit money laundering and one count of making false statements. On April 16, 2007, the Court sentenced the defendant to the statutory maximum term of 13 years' imprisonment, followed by a term of supervised release. The defendant appealed, and the Second Circuit dismissed the appeal on February 4, 2011.

On August 13, 2018, the U.S. Attorney's Office for the Eastern District of New York ("EDNY") filed a civil complaint to revoke the defendant's U.S. citizenship, alleging, among other things, that the defendant had obtained his naturalization by fraud and concealment. United States v. Farhane, 18 Civ. 4347 (MKB) (E.D.N.Y.). On December 19, 2018, the defendant filed a petition

---

[2] Given the Court's familiarity with the case, the Government summarizes only the facts and procedural history directly relevant to the defendant's motion. The Government respectfully refers the Court to the Government's opposition brief to the § 2255 petition, (Doc. No. 244), for a more detailed recitation.

under 28 U.S.C. § 2255 in this case, arguing that Predecessor Counsel was constitutionally ineffective because he did not warn the defendant that denaturalization was a possible consequence of his guilty plea. In support of the § 2255 petition, the defendant filed an affidavit (the "Farhane Affidavit") that purported to describe communications between the defendant and Predecessor Counsel ("Mr. Hueston," below). Excerpts of the Farhane Affidavit are quoted below:

> 27. Mr. Hueston told me that I had three options in response to the criminal charges: I could cooperate with the government; I could plead guilty; or I could go to trial.
>
> 28. I told Mr. Hueston that I wanted to go to trial and that I did not want to plead guilty. Mr. Hueston told me that it was not a good idea to go to trial. He told me that a jury might be more likely to convict me because I was Muslim and did not speak English like a native speaker.
>
> 29. I told Mr. Hueston that my priority was to have the shortest separation from my family. My wife and all six of my children were financially dependent on me at that time. I wanted to return to them as soon as possible to resume my life with them in Brooklyn.
>
> 30. Mr. Hueston told me that he would negotiate the best possible deal in order to minimize my sentence. He advised me that refusing to plead guilty could result in a sentence as long as thirty years.
>
> 31. Despite my wish to go to trial and my reluctance to take a plea bargain, I decided to follow Mr. Hueston's advice. As a businessman, I thought about the plea deal in business terms: I had to take a smaller loss to avoid the risk of a bigger loss, with far more years spent in prison.
>
> . . .
>
> 37. I am not aware of any effort by Mr. Hueston, in negotiating a plea agreement on my behalf, to reach an agreement with the government that would have protected me—or my children—against the loss of U.S. citizenship and my deportation.
>
> 38. At all times during Mr. Hueston's representation of me, my priority was to minimize the length of my separation from my family and the harmful impact on the lives of my wife and children. A plea deal that opened the door to loss of citizenship and deportation, and that exposed two of my children to a similar risk, was contrary to my priorities.
>
> 39. I would not have entered a guilty plea if Mr. Hueston had told me that I could lose my U.S. citizenship as a result.
>
> . . .

> 42. If I had been aware of these consequences of my plea, I would have asked Mr. Hueston to negotiate a different agreement that protected me and my family from these consequences. If that was not an option, I would have refused to plead guilty and insisted on proceeding to trial. I would have chosen to go to trial even if I faced more years in prison as a result.

(Doc. No. 232.) The defendant's brief to the Court cited and relied upon the attorney-client communications described in the above paragraphs. (See, e.g., Doc. No. 229 at 3, 16.) Both the Farhane Affidavit and the brief relying on it were publicly docketed on ECF, without restriction, by the defendant's current counsel. The Court denied the defendant's § 2255 petition, ruling that the defendant's "denaturalization risk stemmed from his misrepresentation about not having engaged in criminal conduct and his having illegally procured naturalization," not from the "conviction itself." (Doc. No. 254 at 4.)

The defendant then appealed the denial of the § 2255 petition, and the defendant, through present counsel, included the Farhane Affidavit in the appellate record. (See Farhane v. United States, 20-1666, Doc. No. 60, Joint Appendix 294–300.) The defendant's appellate briefs again quoted and invited the Second Circuit to rely on the factual assertions in the Farhane Affidavit about the defendant's communications with Predecessor Counsel. (See, e.g., Farhane v. United States, 20-1666, Doc. No. 58 at 43–44; Doc. No. 125 at 23.) A panel of the Second Circuit affirmed this Court's denial of the § 2255 petition, holding that the defendant's "possible denaturalization and possible subsequent deportation are collateral consequences of his guilty plea" that fall outside of the Sixth Amendment. (Farhane v. United States, 20-1666 (2d Cir. Aug. 11, 2023), Doc. No. 158 at 18.)

The defendant successfully moved for rehearing en banc in the Second Circuit and, as in prior rounds of briefs, relied on the paragraphs of the Farhane Affidavit purportedly describing the defendant's communications with Predecessor Counsel. For example, the defendant's opening en banc brief asserted:

> Mr. Farhane initially wished to go to trial, but his trial counsel advised that proceedings against a foreign-born, Muslim defendant would not be conducted fairly. See A297 ¶28; A225 (Def. Sentencing Mem., Ex. 2 at 5). Mr. Hueston began negotiating a plea agreement. A298 ¶30. Mr. Farhane told his counsel that his primary goal was to return to his family as soon as possible and that he wished only to resume his life with them in Brooklyn. A297-299 ¶¶29, 38. At no point did trial counsel discuss with Mr. Farhane the risk of denaturalization and deportation. Id. ¶¶32-33, 36. As far as Mr. Farhane is aware, trial counsel did not engage in any efforts to negotiate a plea agreement to avoid these consequences. Id. ¶37.

(Farhane v. United States, 20-1666, Doc. No. 224 at 6–7.) Each of these appellate briefs and the Joint Appendix were publicly docketed without restriction by the defendant's present counsel.

On October 31, 2024, a divided Second Circuit, sitting en banc, issued an opinion reversing the panel decision and holding that "the Sixth Amendment entitles a naturalized U.S. citizen facing the risk of deportation following denaturalization to no less protection than a noncitizen facing the

risk of deportation." (En Banc Op. at 2.) The en banc decision addressed only the threshold question of whether the defendant's claim was cognizable under the Sixth Amendment: it did not address the merits of the claim itself. The Second Circuit made clear that, on remand, the Court was free to decide whether there was a factual basis for both prongs of the Strickland inquiry, i.e. whether Predecessor Counsel's performance was objectively unreasonable and whether the defendant was prejudiced as a result. (En Banc Op. at 32–37.) While the Second Circuit stated that this Court could conduct fact-finding in whatever manner the Court found appropriate, it suggested that Predecessor Counsel be afforded an opportunity to "describe or to explain his conduct." (Id. at 35.) The Second Circuit further suggested that the defendant "may be heard in person, too, instead of solely by affidavit." (Id.)

With respect to the factual disputes to be resolved on remand, the Second Circuit identified, among others, "whether the defendant has demonstrated a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (Id. at 36 (citation and quotation marks omitted)). Specifically, the Second Circuit suggested that the Court permit the parties to engage in factfinding that would test the "credibility of Farhane's assertion that, had he been properly advised, he would have insisted on proceeding to trial." The Second Circuit directed that this inquiry "should" include "whether Farhane might have placed particular emphasis on immigration consequences in deciding whether or not to plead guilty—enough to forgo the ten-year reduction in his maximum possible sentence that resulted from his entry of a guilty plea." The Second Circuit further suggested that the Court might wish to consider the defendant's claim that, at the time of the plea, he believed "he could have presented viable defenses at trial, and that his trial counsel could have leveraged these defenses to negotiate an alternative plea deal that foreclosed the risk of denaturalization and deportation." (Id. (citations and quotation marks omitted).)

On remand, the parties conferred to discuss the scope of the attorney-client privilege waiver in light of the posture of the case. The parties failed to reach agreement and the defendant's motion followed.

## II. **Applicable Law**

It is well-established that "the attorney-client privilege cannot at once be used as a shield and a sword." United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991). A litigant "may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." Id. The privilege is therefore deemed "waived when defendant asserts a claim that in fairness requires examination of protected communications." Id.

In the context of 28 U.S.C. § 2255 petitions, a defendant cannot argue that an attorney was ineffective for giving (or failing to give) some advice and then invoke the privilege to prevent the attorney from disclosing communications relevant to the claim. The filing of an ineffective assistance claim operates as a privilege waiver as to all relevant communications with the attorney at issue. Frias v. United States, 2009 WL 1437797, at *1 (S.D.N.Y. May 20, 2009) ("Accordingly, petitioner has waived attorney-client privilege over communications with counsel that are relevant to the ineffective assistance of counsel claims raised in the § 2255 petition"); Hardy v. United States, No. 10 CR. 1123 JSR, 2012 WL 2674535, at *1 (S.D.N.Y. July 5, 2012) ("But it is settled

law that a § 2255 petition asserting ineffective assistance waives the attorney-client privilege in all respects relevant to the petition."); United States v. Green, 2020 WL 6822986, at *4 (S.D.N.Y. Nov. 19, 2020); United States v. Cruz-Polanco, 2023 WL 119438, at *1 (S.D.N.Y. Jan. 6, 2023) ("By making this motion, you have waived the attorney-client privilege you had with your former attorney to the extent relevant to determining your claim."). Put differently, if the defendant "places advice that it has received from an attorney at issue in litigation, it has waived the privilege with respect to all such advice on the same topic." Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa S.S. Co., 232 F.R.D. 191, 198 (S.D.N.Y. 2005); In re Omnicom Grp., Inc. Sec. Litig., 233 F.R.D. 400, 413 (S.D.N.Y. 2006) (same).

Judges in this District routinely require defendants who bring ineffective assistance claims to provide written consent to waive all attorney-client communications relevant to the claim, noting, however, that the privilege was already waived when the claim was filed.[3] See, e.g., Brown v. United States, 2023 WL 3626466, at *1 (S.D.N.Y. Apr. 13, 2023) (Ramos, J.) ("As the Government recognizes, the typical practice of courts in this Circuit is to require that the Petitioner formally waive his attorney-client privilege before proceeding further on a § 2255 motion implicating advice of counsel, even though a Petitioner's claim for ineffective assistance of counsel usually constitutes an implicit waiver of attorney-client privilege."); United States v. Cruz-Polanco, 2023 WL 119438, at *1 (S.D.N.Y. Jan. 6, 2023) (Oetken, J.) ("By making this motion, you have waived the attorney-client privilege you had with your former attorney to the extent relevant to determining your claim."); United States v. Ulbricht, No. 14 CR. 68 (LGS), 2019 WL 5957163, at *1 (S.D.N.Y. Nov. 13, 2019) (Schofield, J.) ("WHEREAS by making the motion, the movant has waived the attorney-client privilege as a matter of law."); Sanders v. United States, 2024 WL 3551157, at *2 (S.D.N.Y. July 26, 2024) (Engelmayer, J.) (denying § 2255 petition where defendant declined to sign consent form); United States v. Cristobal, 20 Cr. 463 (KPF), Doc. No. 253 (Failla, J.) ("In fact, as a matter of law, you have waived the attorney-client privilege by making your motion, which means that if you wish to press your claim of ineffective assistance, you cannot keep the communications between yourself and your lawyer a secret — you must allow them to be disclosed to the Government and to the Court pursuant to Court order.").

When the attorney-client privilege as to a communication has been waived, the privilege no longer protects the communication at all. In other words, a communication as to which the privilege has been waived is on the same legal footing as a communication that is simply not privileged. Indeed, the Second Circuit's definition of the attorney-client privilege specifically excludes communications as to which the privilege has been waived:

> The broad outlines of the attorney-client privilege are clear: (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the

---

[3] In an abundance of caution, the Government respectfully requests that in addition to entering the Proposed Order, the Court provide a consent form to the defendant making clear that if he does not waive attorney-client privilege over relevant communications, the Court will deny the § 2255 petition on that basis.

> client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) *except the protection be waived*.

United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997) (citation and quotation marks omitted) (emphasis added).

Review of communications as to which the privilege has been waived thus does not require a "filter" process or a "taint team." (Def. Br. at 21–22.) Those procedures are used when the Government has taken possession of materials over which there is an intact and valid attorney-client privilege. See, e.g., United States v. Avenatti, 559 F. Supp. 3d 274, 282 (S.D.N.Y. 2021) (describing procedures and listing cases in which such procedures were approved).

### III. Discussion

#### A. The Defendant Has Already Waived Attorney-Client Privilege as to Each of the Waived Subjects in the Government's Proposed Order

The Government's Proposed Order identifies the materials as to which attorney-client privilege has been waived as follows:

> [A]ll communications between the defendant and Mr. Hueston—written or oral—about the following subjects (the "Waived Subjects") which directly bear on the Strickland inquiry: (1) the defendant's naturalization, including whether the naturalization overlapped in time with the offense conduct, (2) the defendant's desire to live in the United States, (3) the nature and strength of the defendant's ties to Morocco or another foreign country, (4) the defendant's attitudes toward United States citizenship for himself or his family, (5) the perceived strength of the Government's evidence, including potential trial defenses, and (6) the defendant's goals and instructions to Mr. Hueston with respect to plea negotiations.

(Ex. A at 2.) Each of Waived Subjects is directly relevant to one of the Strickland prongs. The first Waived Subject bears on the reasonableness prong. The second through sixth Waived Subjects bear on the prejudice prong. Again, the Second Circuit asked the Court to determine the "credibility of Farhane's assertion that, had he been properly advised, he would have insisted on proceeding to trial," including "whether Farhane might have placed particular emphasis on immigration consequences in deciding whether or not to plead guilty—enough to forgo the ten-year reduction in his maximum possible sentence that resulted from his entry of a guilty plea" as well as the plausibility of defendant's claim that "he could have presented viable defenses at trial, and that his trial counsel could have leveraged these defenses to negotiate an alternative plea deal that foreclosed the risk of denaturalization and deportation." (En Banc Op. at 36.) In arguing that the waiver extends only to the first Waived Subject—and none of the others—the defendant is asking the Court to ignore the second prong of Strickland and this portion of the Second Circuit's en banc decision.

Perhaps recognizing that each of the Waived Subjects is directly relevant to his Strickland claim, the defendant attempts to persuade the Court that the privilege is waived only as to those

communications that he chooses to "rely" on, rather than all communications that are relevant to the claim. (Def. Br. at 6–8.) That assertion ignores the numerous cases, cited earlier, stating that the privilege is waived as to "all attorney-client communications relevant to the claim." E.g. Brown, 2023 WL 3626466, at *1.

The defendant relies principally on In re Cnty. of Erie, 546 F.3d 222, 229 (2d Cir. 2008) for the proposition that "reliance" is narrower than "relevance" and that he can maintain the privilege over relevant communications so long as he chooses not to "rely" on them. (Def. Br. at 6–7.) A careful reading of Erie makes clear that it supports no such proposition. Erie was a civil tort action, in which the plaintiffs alleged that the defendants conducted illegal strip searches. Id. at 224. In the course of discovery, the plaintiffs sought access to some emails over which the defendants claimed privilege. The plaintiffs argued that any privilege over the emails had been waived because the emails discussed subjects that were "relevant" to the lawsuit. However, the defendants themselves "[did] not rely upon the advice of counsel in the assertion of their defense in this action." Id. at 229. In other words, the privilege-holders (the defendants) had not attempted to use attorney-client communications for any purpose. On those facts, the Second Circuit held that mere relevance to the case was not enough: "privileged information may be in some sense relevant in any lawsuit." Id. Waiver requires, in addition, that the privilege-holder "rely on privileged advice from his counsel to make his claim or defense." Id.

But the reliance described in Erie exists in this case and in every case in which a criminal defendant asserts ineffective assistance of counsel. Indeed, the crux of *every* Strickland claim is that the attorney provided advice (or failed to provide advice) in an objectively unreasonable manner that prejudiced the defendant. Erie's discussion of reliance does not support what the defendant hopes to do here, which is to pick and choose among relevant attorney-client communications, "relying" only on communications that suit him and invoking the privilege to conceal communications that undercut him. That sort of "selective" disclosure "for self-serving purposes" is exactly the gamesmanship that the implied waiver doctrine was formulated to prevent. Bilzerian, 926 F.2d at 1292.

Moreover, even if the Court were to adopt the defendant's idiosyncratic view of "reliance," he has quite clearly relied on attorney-client communications as to each of the Waived Subjects in this litigation. The Farhane Affidavit purports to describe—in some detail—communications (or the absence of communications) between the defendant and Predecessor Counsel about each of the Waived Subjects. The defendant relied upon that affidavit in the strongest possible way: he *submitted it in support* of his § 2255 petition and quoted and cited from the paragraphs describing attorney-client communications in his briefs before this Court, in the appellate litigation before the Second Circuit panel, and before the en banc Second Circuit.

The defendant argues that his repeated reliance on these communications somehow does not count because these parts of his affidavit were "not relevant," "not necessary," or related to issues that "can be established by other evidence." (Def. Br. at 11–12.) That is not how reliance works. The defendant cannot repeatedly invite the Court to consider X, Y, and Z in granting relief and, upon receiving relief, insist that he did not "rely" on X because Y and Z were sufficient. Even if reliance (rather than relevance) were the touchstone, the question is whether the defendant *did*

*rely* on the privileged communications, not whether he needed to rely on them or could have proceeded in some other fashion.

Represented by a well-staffed team of highly skilled and capable attorneys, the defendant made the strategic choice to disclose communications about the Waived Subjects in order to maximize his chances at relief in this Court and on appeal. He should not now be permitted to escape the consequences of that decision.

Finally, the defendant acknowledges that the implied waiver doctrine is designed to ensure "fairness to the party's adversary"—here, the Government. Erie, 546 F.3d at 226. The defendant's requested invocation of the privilege is grossly unfair. To take a few examples:

- The defendant wants the Court to believe that "I told Mr. Hueston that I wanted to go to trial and that I did not want to plead guilty," (Doc. No. 232 ¶ 28), but seeks to bar Predecessor Counsel from disclosing any communications shedding light on the defendant's appetite for trial or desire to plead guilty.

- The defendant wants the Court to believe "I would not have entered a guilty plea if Mr. Hueston had told me that I could lose my U.S. citizenship as a result," (id. ¶ 39), but seeks to bar Predecessor Counsel from disclosing any viewpoints about U.S. citizenship that the defendant expressed to Predecessor Counsel.

- The defendant wants to the Court to believe "If I had been aware of these [immigration] consequences of my plea, I would have asked Mr. Hueston to negotiate a different agreement that protected me and my family from these consequences," but seeks to bar Predecessor Counsel from revealing the instructions that the defendant gave him during plea negotiations.

- The defendant wants the Court to believe "I would have chosen to go to trial even if I faced more years in prison as a result," (id. ¶ 42), but seeks to bar Predecessor Counsel from disclosing any communications about the defendant's risk tolerance, at the time of the plea, for a longer sentence.

As to each of the Waived Subjects, the defendant has put before the Court a self-serving account of communications between himself and Predecessor Counsel. And as to each, the defendant seeks to prevent Predecessor Counsel from disclosing any contradictory or contextualizing evidence on the same topics. That is unfair.

### B. There Is No Basis for a Protective Order to Restrict the Government's Use of Materials as to Which the Privilege Is Waived

Second, the defendant demands that the Court enter a Protective Order that:

(1) limits the use of communications disclosed by trial counsel to this proceeding;
(2) prohibits the government from accessing, consulting, or using any such communications in any other proceeding, including but not limited to any retrial of

> Mr. Farhane and the Denaturalization Case; (3) requires any such communications filed in this proceeding to be filed under seal; and (4) prohibits individuals participating for the government in this proceeding from participating in or communicating about this matter with any individuals participating for the government in (a) any re-prosecution of Mr. Farhane and (b) the Denaturalization Case.

(Def. Br. at 19.)  With respect to conditions (1) and (2) above, it is hard to imagine how communications about the Waived Subjects could possibly be relevant in any re-prosecution of the defendant or in the denaturalization proceeding.[4]  Notably, the Waived Subjects do *not* include communications between the defendant and Predecessor Counsel about factual guilt.  The Government does not seek such communications.[5]

Instead, the Government seeks only communications about the Waived Subjects, which pertain to the defendant's desire to remain in the United States, his instructions to counsel in plea negotiations, and so forth.  The defendant has given no example of how any communication about these subjects could be used at a criminal retrial or at the denaturalization proceeding.  The Government does not intend to use communications about the Waived Subjects at retrial.  At the same time, the defendant has cited no controlling case law[6] that compels the Court to enter a Protective Order forbidding the Government from doing so.

The defendant cites Federal Rule of Evidence 502(d), (Def. Br. at 15), but that Rule does not apply.  Rule 502(d) provides "A federal court may order that the privilege or protection is *not waived* by disclosure connected with the litigation pending before the court — in which event the disclosure is *also not a waiver* in any other federal or state proceeding" (emphases added).  Here, the Court's ruling that privilege has been waived as to the Waived Subjects would be an order that

---

[4]  The defendant asserts that declining to issue such a Protective Order would amount to "offering the government a tactical advantage by virtue of the unconstitutionality of the original proceeding." (Def. Br. at 20.)  That presumes the unconstitutionality of the original proceeding, which is the question the Court has yet to decide.

[5]  One of the Waived Subjects is "*the perceived strength* of the Government's evidence, including potential trial defenses." If the defendant and Predecessor Counsel subjectively believed the evidence was strong or did not believe there were real defenses at trial, that would be relevant to the Strickland prejudice inquiry because that would undercut the defendant's assertions, in the Farhane Affidavit and in his briefs, that he would have gone to trial and that he had trial defenses to "leverage" in plea discussions.  (See En Banc. Op. at 36.)  Those subjective assessments of litigation risk are not evidence of substantive guilt, and the Government does not intend to use them at a criminal retrial.

[6]  The Ninth Circuit remarked upon this scarcity of examples in Bittaker v. Woodford, the principal case on which the defendant relies. 331 F.3d 715, 727 (9th Cir. 2003) ("[W]e have been unable to find very many cases where the prosecution has even attempted to use privileged information obtained as a result of federal discovery procedures in a defendant's retrial.").

privilege *is waived in this case*, in which event the Rule has no application. The Rule does not stand for the proposition the defendant desires: that the privilege can be waived in this Court but nonetheless invoked in other judicial proceedings.

The defendant has also offered no justification for condition (3), that communications about the Waived Subjects must be sealed. The defendant publicly docketed the Farhane Affidavit in February 2019, and it has remained publicly viewable for over six years without any effort by the defendant to seal it. (Doc. No. 232.) The defendant's briefs in this Court and the Second Circuit quoting the Farhane Affidavit have likewise been fully public and unredacted for many years. Under the First Amendment, the public and the press enjoy a presumptive right of access to judicial documents. See generally Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). To be sure, Lugosch recognizes that the "privacy interests" of litigants may sometimes overcome the presumption, id. at 120, but the defendant abandoned those privacy interests (along with the privilege itself) when he self-disclosed attorney-client communications about the Waived Subjects. The defendant cannot explain why his description of communications may be publicly docketed while Predecessor Counsel's descriptions of communications on those same topics must be sealed. The public is entitled to a complete view of the facts in this case.

Finally, the defendant has provided no authority for condition (4), which demands that the Government assign new prosecutors in the event of a retrial and which seeks to bar the Government from sharing information about the Waived Subjects with attorneys handling the denaturalization case.[7] The defendant casts this as a request for a "taint team," but he misunderstands what a "taint team" is. A "taint team" is necessary when the Government comes into possession—through, for example, a search warrant—of materials that may include privileged communications. Under those circumstances, a separate "taint team" of attorneys is tasked with identifying and filtering out the privileged communications, so the prosecution team is not exposed to them. This procedure is necessary because the attorney-client privilege as to such communications remains intact. See generally Avenatti, 559 F. Supp. 3d at 282.

Here, communications about the Waived Subjects will be produced to the Government pursuant to the Court's Order deeming the privilege to be waived. The Government's review of such communications will be no different than the Government's review of materials that were never privileged in the first place.

### IV. Conclusion

For the reasons set forth above, the defendant's motion for a narrow waiver of attorney-client privilege and for a Protective Order should be denied. The Government respectfully requests that the Court instead enter the Government's Proposed Order finding that the defendant waived attorney-client privilege as to the Waived Subjects defined in that Order.

---

[7] Since the initial filing of the § 2255 petition and through the present, the Government has periodically conferred with attorneys handling the denaturalization proceeding regarding the status of the two cases. The denaturalization proceeding is being handled by attorneys at the U.S. Attorney's Office for the Eastern District of New York and the Office of Immigration Litigation.

      The Government further respectfully requests that the Court provide the defendant with a written consent form explaining that if he does not give Predecessor Counsel consent to disclose relevant attorney-client communications, the § 2255 petition will be denied.

      Respectfully submitted,

      JAY CLAYTON
      United States Attorney for the
      Southern District of New York

by:    /s/ Jun Xiang
      Jun Xiang
      Assistant United States Attorney
      (212) 637-2289

**CC:**
Counsel for Abderrahmane Farhane